## White v. Keystone Insurance Co.

*William T. Lawson III*, for plaintiff.

*Richard K. Hohn,* for defendant.

McINERNEY, *J.,* May 23, 2000—Plaintiff Toreatha White has filed a declaratory judgment action against defendant Keystone Insurance Company, asking the court to declare that Keystone is responsible to provide coverage under a policy issued to its insured, Charles Wiener, for an occurrence that resulted in the tragic death of Carol White.

Given that this is a declaratory judgment action, it is subject to the rules of procedure governing equity matters at large. See Pa.R.C.P. 1601 (stating that the practice and procedure in actions for declaratory judgment must follow the rules of equity).

In conformity with the procedural requisites, this court is issuing an adjudication notice and decree nisi as mandated under Pa.R.C.P. 1517. See *Winkelman v. PFRACP*, 418 Pa. Super. 439, 614 A.2d 717 (1992) (the procedures applicable to equity matters govern declaratory judgment actions, requiring the issuance of a decree nisi and compliance with Rule 1517), *overruled on other grounds*, *Swartz v. Union Mutual Insurance Co.*, 547 Pa. 632, 692 A.2d 1058 (1997); see also, *Hertz v. Hertz*, 302 Pa. Super. 259, 448 A.2d 626 (1982); *Temple University v. City of Philadelphia*, 698 A.2d 118 (Pa. Commw. 1997) (requiring compliance with Rule 1517 for actions involving applications for declaratory judgment).

## I. FINDINGS OF FACT

The parties have stipulated to the facts. They have been made part of the record and need not be repeated here. See "Stipulation of agreed upon facts."

## II. STATEMENT OF THE ISSUES

Defendant Keystone does not dispute the fact that its insured, Charles Weiner, was negligent in providing a gun to Houser, and that Weiner's negligence ultimately resulted in the tragic death of Ms. White. Defendant argues, however, that Weiner was not covered under the policy in question because his action in giving the gun to Houser was intended to protect the assets of the bar and therefore falls under the "business pursuits" exception to the policy. Plaintiff counters that the exclusion does not apply because at the time of the shooting, although Weiner was in the process of purchasing the bar, Weiner was not yet the legal owner of the bar, and the act of providing the gun in no way furthered the purchase of the bar which plaintiff argues is the only means by which that action could be classified as a business pursuit.

## III. DISCUSSION

In deciding the applicability of the "business pursuits" exception to a particular activity of an insured, the majority of courts, including our own, have applied a two-prong test; first, there must be a "continuous or regular" activity, and second, it must be engaged in for the purpose of earning an income, profit or livelihood. See *Travelers' Indemnity Co. v. Fantozzi*, 825 F. Supp. 80 (E.D. Pa. 1993).[1] *La Coe v. Valley Forge Insurance Co.*, 31

---

1. Applying Pennsylvania law, the district court determined that for an activity to be a "business pursuit" and subject to exclusion under a general liability policy, such as the case here, it must be a con-

D.&C.3d 156 (1984), citing *State Mutual Cyclone Insurance Co. v. Abbot*, 52 Mich. App. 103, 216 N.W.2d 606, 608 (1974).[2] We know of no case which specifically addresses the issue of whether an agreement to purchase an ongoing business meets the first prong of this test. It is clear, however, that the requirement the activity be both regular and continuous cannot be met in this case. The continuous and regular prong is intended to distinguish business pursuits from part-time, occasional, or hobby-like activities. In *La Coe*, *supra*, the insured was engaged in the practice of cutting treetops for his neighbor and others. He would cut their trees in exchange for keeping the firewood he produced. The court found that, though the insured had been cutting wood in this manner for approximately a year and a half, he did so primarily for personal use, selling wood on perhaps four occasions during that time. In holding that the business pursuit exception did not apply, the court found that selling wood four times in an 18-month period was a "sporadic and isolated activity, rather than a continuous business pursuit." *Id*. at 160.

The issue in this case is not sporadic versus continuous, the issue is, when does the activity assume the stat-

---

tinuous or regular activity engaged in for the purpose of earning an income, profit or livelihood.

2. The term "business" is defined in Weiner's policy as a "trade, profession or occupation." The same definition appeared in the policies in *La Coe* and in *Fantozzi*. There is no evidence in the record that on November 25, 1995, Weiner was engaged in the trade, profession or occupation of tavern owner.

us of a business pursuit. It is clear in this case that the signing of the agreement of sale evidenced Weiner's intention to purchase the business, a necessary first step to engaging in that business. There is no question Weiner hoped to obtain and operate the bar and, in fact, eventually did. However, the first prong of the test cannot be met because, at the time of the occurrence, there was no ownership, "continuous" or otherwise, by Weiner. At the time of the incident, not only was the sale still pending, but the sale was contingent on Weiner's obtaining the liquor license. (See agreement of sale, ¶20, pp. 18-19.) While the existence of the agreement evidenced Weiner's intent to take over this business, he had not done so. There was not even a set date for settlement. According to the agreement, settlement was to occur within 15 days of the final order approving transfer of the license. (See agreement, ¶16, p. 16.) Weiner paid a $6,000 deposit into escrow which was refundable if the license was not approved. Inventory was not to be taken, nor paid for, until immediately prior to settlement. (See agreement, ¶11, p. 13.) The agreement specifically stated the seller continued to bear the risk of any loss by fire or other casualty, and, furthermore, Weiner was not bound by any employment agreements or contracts. (See agreements ¶¶25, 30, pp. 22-24.)

The license approval did not come through until January 1996, and settlement did not occur until January 17, 1996. Timing is, unquestionably, a factor here. Weiner could only be said to be acting in an individual capacity when he gave his gun to Houser. Weiner had no author-

ity over Houser, and any assets in the bar, as well as the bar itself, belonged to the owner and not Weiner. Therefore, this court is constrained to find that the business exclusion does not apply.

Even if the exclusion were to apply, it wouldn't end our inquiry. The policy provides that the business pursuits exclusion does not apply to "activities which are usual to non-business pursuits." The difficulty in interpreting this exception has caused numerous courts to find the exception ambiguous. 35 ALR 5th 375. There is clearly no unanimity of opinion in how to apply the exception, despite its appearance in almost every homeowners general liability policy. 35 ALR 5th 375.

Again, we find no Pennsylvania case directly on point, but in *Curbee Ltd. v. Rhubart,* 406 Pa. Super. 505, 594 A.2d 733 (1991), *alloc. denied,* 529 Pa. 649, 602 A.2d 859 (1992), the court found that the insured, a restaurateur, was engaged in a business pursuit when she hosted a luncheon for her employees at a separate, independently owned restaurant. However, the court determined that her homeowners policy provided coverage for an injury suffered by an employee attending the event, because the activity fell within the exception to the business pursuits exclusion. The court held that, as a social function, even though it was only for employees and intended to boost employee morale, it was an activity which was "incident to a social and non-business purpose." Although the insured was clearly engaged in a business pursuit, the activity was not directly related to running a restaurant.

Similarly, in *Myrtil v. Hartford Insurance Co.,* 510 F. Supp. 1198 (E.D. Pa. 1981), a Bucks County restaurateur hosted a party for her employees at a home she rented at the New Jersey shore. The district court, in applying Pennsylvania law, held that although the business pursuits exclusion applied, the policy contained the same non-business pursuits exception to the exclusion. The court determined that the wording of the exception was ambiguous, requiring it to be construed in favor of coverage for injuries one of the guests incurred when he dove into a canal adjacent to the property. The *Myrtil* decision is not unique in interpreting the exception as rendering the exclusion ambiguous; such a course has been followed by a number of courts in keeping with decisional precedent that any ambiguity is construed against the insurer. See 35 ALR 5th 375.

In contrast, in *Bullock v. Pariser,* 311 Pa. Super. 487, 457 A.2d 1287 (1983), one of the relatively few cases interpreting the business pursuits exception in Pennsylvania, the result was different. In *Bullock,* the owners, partners in a day care operation, kept guard dogs on the premises for security purposes. Neither business partner resided on the premises, which were open only during business hours. The dogs, however, were present at all times. The *Bullock* court held injuries to a third party incurred when he was bitten by one of the dogs arose out of the "business pursuits" of the owners and, therefore, were not covered under the partners' homeowner policies. In reaching this decision, the court found the partnership was formed for the specific purpose of oper-

ating the day care business, and covered by its own general liability policy. In reaching its decision, the court noted that neither partner sought coverage under their homeowners policies; the issue arose only due to the insolvency of the business carrier. The court determined that this was a clear-cut case of a "business pursuit," and they need not examine the applicability of the exception.[3]

We need not reach the question of the applicability of the exception or whether we would find it ambiguous, because we have concluded that as Weiner was not the owner of the bar, the exclusion does not apply. Just as the agreement of sale specified Weiner was under no obligation to carry insurance for fire or other casualty loss during the pendency of the sale because he was not the owner of the bar and not legally responsible for it, he was under no obligation to obtain business liability insurance separate from his own homeowners liability policy during that limited period. Not until January 17, 1996, when that status changed, could his actions with regard to the bar be excluded.

---

3. In dicta, however, the court made reference to a number of cases from other jurisdictions involving the discharge of firearms, where courts held the exception did not apply. See *Neal v. Celina Mutual Insurance Co.,* 522 S.W.2d 179 (Ky. 1975); *Kermans v. Pendleton,* 62 Mich. App. 576, 233 N.W.2d 658 (1975).

## IV. CONCLUSIONS OF LAW
## DECREE NISI

It is hereby determined that defendant Keystone is responsible for providing coverage under the policy issued to Charles Weiner.

---

## STIPULATION OF AGREED UPON FACTS

(1) Plaintiff Toreatha M. White is a resident of the City and County of Philadelphia, Commonwealth of Pennsylvania, and is the administratrix of the estate of Carol Lynn White, deceased, having been appointed by the Register of Wills of Philadelphia County, Pennsylvania, on November 29, 1995, bearing administration number 6277 of 1995, and is also the intestate heir of the decedent.

(2) William R. Houser is an adult individual, currently residing at 3437 North Carlisle Street, in the City and County of Philadelphia, Commonwealth of Pennsylvania.

(3) 1252 Bar Inc. is a corporation organized and existing under and by virtue of the internal laws of the Commonwealth of Pennsylvania, having a place of business at 1252 S. 21st Street, in the City and County of Philadelphia, Commonwealth of Pennsylvania.

(4) Charles Weiner is an adult individual.

(5) On or about November 21, 1995, and all times relevant herein, Joseph Silverman was the owner and operator of a certain tavern business in current opera-

tion known as the 1252 Bar, located at 1252 S. 21st Street, in the City and County of Philadelphia, Commonwealth of Pennsylvania.

(6) On or about November 21, 1995, for a long time prior thereto, and at all relevant times, Joseph Silverman was the sole shareholder, and sole officer and director of the bar.

(7) On August 11, 1995 and for all relevant times, Weiner had entered into an agreement with the bar to purchase the assets of the bar, and with the Silvermans to purchase the real property, which agreement was awaiting approval from the Pennsylvania Liquor Control Board.

(8) On or about November 21, 1995, for a long time prior thereto, and at all relevant times, Weiner was the registered and actual owner of a certain handgun manufactured by Smith and Wesson, same being a 44 magnum revolver, model 29 blue, with a 4-inch barrel bearing serial number AZF8307.

(9) On or about November 21, 1995, for a long time prior thereto, and all relevant times, Houser was employed by the bar as the manager of the business.

(10) On or about November 21, 1995, for a long time prior thereto, and all relevant times, Weiner specifically authorized, placed and permitted the gun to remain on the premises for the specific and express purpose of being used by employees of the bar, including Houser.

(11) On or about November 21, 1995, at or about 11:15 p.m., decedent was in the premises and a business invitee of the bar.

(12) At the aforementioned time and place, Houser, acting in the course and scope of his employment and authority, had placed the gun on his person, at the express and/or implied direction of Weiner and with the express and/or implied permission of Weiner.

(13) Houser has had no formal firearms training.

(14) Houser is not eligible to own and/or carry a firearm, since Houser has been convicted of a crime of violence, to wit, simple assault, under municipal court no. 9606-2950, before the Honorable Judge Kaffrison, and was sentenced on or about August 20, 1990 to two years probation.

(15) At or about the aforementioned time and place, Houser had extracted the gun from his waistband and negligently and carelessly handled the gun, so as to cause same to discharge a bullet which struck decedent's body and entered the right lateral chest wall 12 inches below the top of the shoulder and nine inches to the right of the midline, roughly in the mid-axillary line. Thereafter, the bullet passed leftward and moderately downward, passing through skin and muscle overlying the lateral right chest wall, entering the right hemithorax through the ninth right rib, grazing the right lower lung lobe laterally. Thereafter, the bullet pierced the right hemidiaphragm. Thereafter, the bullet perforated the right lobe of the liver, then the bullet perforated the right kidney. Thereafter, the bullet continued on its track, perforating the inferior vena cava. Thereafter, the bullet perforated the aorta at the level of the renal arteries. Thereafter, the bullet went on to perforate the left kidney and finally

exited the abdominal cavity along the left lateral and lower abdominal wall, 20 inches below the top of the shoulder and 12 inches to the left of the midline. The track of the bullet caused the decedent's entire abdomen to fill with blood, resulting in hemorrhage which caused her death.

(16) As a result of the impact of the bullet, the decedent suffered injuries which resulted in her death at 1 a.m. the next day at Thomas Jefferson University Hospital, in the City and County of Philadelphia, Commonwealth of Pennsylvania.

(17) The negligence of Weiner consisted of the following:

(a) entrusting the gun to Houser and/or allowing him access thereto when he knew or should have known that Houser had a history of violent behavior;

(b) entrusting the gun to Houser and/or allowing him access thereto when he knew or should have known that Houser had no firearms training;

(c) entrusting the gun to Houser and/or allowing him access thereto when he knew or should have known that Houser had been convicted of a crime of violence and of carrying firearms on a public street without a license;

(d) entrusting the gun to Houser and/or allowing him access thereto for its use on the premises when Weiner knew or should have known that Houser was likely to use or brandish the gun during business operating hours, in the presence of business invitees such as the decedent;

(18) As a direct and proximate result of the aforesaid acts of negligence, decedent suffered grave and serious injuries which ultimately led to her demise.

(19) At all times relevant and on November 21, 1995, Weiner was the owner of and was the insured under a policy of insurance, being policy number 229018, issued by defendant.

(20) The policy was fully paid and in full force and effect on November 21, 1995 and at all times relevant hereto.

(21) On November 21, 1995 and at all times relevant hereto, defendant was duly licensed and did engage in the business of providing insurance in the Commonwealth of Pennsylvania.

(22) Attached hereto, incorporated by reference and labeled exhibit A is a true and correct copy of the entire policy.

(23) On November 21, 1995, the bar was the holder of liquor license number TR11436 issued by the Pennsylvania Liquor Control Board.

(24) No one may operate a business selling alcoholic beverages in the Commonwealth of Pennsylvania unless they hold a liquor license for the premises on which alcohol is to be sold.

(25) Weiner entered into an agreement with the bar on or about August 11, 1995 to purchase the assets of the bar, including the liquor license.

(26) Attached hereto, incorporated by reference and labeled exhibit B is a true and correct copy of the agreement to purchase the assets of the bar.

(27) On or about August 30, 1995, Weiner applied for a transfer of the liquor license to 1252 A & M Inc., a corporation in which he was the sole shareholder, director and officer.

(28) Attached hereto, incorporated by reference and labeled exhibit C is a true and correct copy of the application for transfer of the liquor license which was forwarded to the Pennsylvania LCB on August 30, 1995.

(29) The transfer of the liquor license was approved on January 11, 1996.

(30) Attached hereto, incorporated by reference and labeled exhibit D is a true and correct copy of the approval of the license transfer.

(31) On or about January 17, 1996, settlement was held on the purchase of the assets of the bar.

(32) Attached hereto, incorporated by reference and labeled exhibit E is a true and correct copy of the settlement sheet.

(33) Weiner began to operate the bar on January 17, 1996, the date of settlement.

(34) Plaintiff has previously filed a lawsuit against Weiner, which suit is presently deferred.

(35) Keystone has denied coverage under the policy.

(36) Weiner has assigned all right, title and interest to bring a declaratory judgment action against Keystone to plaintiff, which is the subject of this lawsuit, wherein plaintiff and defendant now seek a ruling on the issue of coverage from this court.